IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **AMBER TROESTER** )<br>)<br>*Plaintiff*, )<br>)<br>v. )<br>)<br>**CHS MIDDLE EAST, LLC.** )<br>**10701 Parkridge Blvd.,** )<br>**Suite 200** )<br>**Reston, Virginia 22603** )<br>)<br>Serve: )<br>)<br>CT Corporation System )<br>4701 Cox Road )<br>Suite 301 )<br>Glen Allen, Virginia 23060 )<br>)<br>*Defendant*. )<br>) | Case No. 1:18cv871   (AJT/JFA) |

### CIVIL COMPLAINT FOR EQUITABLE AND MONETARY RELIEF AND DEMAND FOR JURY

Plaintiff Amber Troester brings this civil complaint of unlawful discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII") against CHS Middle East, LLC ("CHS").

### JURISDICTION AND VENUE

1.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

2.  Plaintiff's employment agreements with Defendant specify that the Commonwealth of Virginia courts shall have exclusive jurisdiction and venue over any proceeding arising from or related to this employment agreement.

1

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant may be found in this District because Defendant's headquarters is located in Reston, Virginia, and Defendant regularly and/or systematically conducts affairs or business activities in Reston, Virginia.

## PARTIES

4. Plaintiff Amber Troester is a resident of Pima County, Arizona, and worked as an EMT-Paramedic for CHS at various locations in Iraq from in or about 2014 until her wrongful termination on or about November 2, 2017.

5. Defendant CHS is a Maryland corporation that maintains its nerve center and transacts business at 10701 Parkridge Boulevard, Suite 200, Reston, Virginia.

## FACTUAL ALLEGATIONS

6. Troester started working for CHS in April, 2014, and she is a bisexual female.

7. Troester earned her paramedic certificate in 2006 and has over eleven years of paramedic experience.

8. Defendant has a contract with the U.S. State Department to provide medical services at Embassy locations and medical facilities in Iraq.

9. Troester signed one-year employment contracts with CHS to serve as an EMT-Paramedic in Iraq.

10. When Troester first arrived in Iraq, she was assigned to the Baghdad Diplomatic Support Center ("BDSC").

11. While assigned to BDSC, Troester began a relationship with CHS employee John Johnson. Johnson helps CHS employees secure visas and passports for their movement throughout Iraq.

12. Troester attempted to end her relationship with Johnson After approximately six months, as Johnson was becoming increasingly possessive of Troester.

13. Johnson was friends with Deputy Director of EMS at the time, Geoffrey Henriquez, and Henriquez declared to Johnson in or around the fall of 2014 that "bisexual chicks are liars and cheats." Henriquez would also share images of Troester's social media accounts with Johnson after Troester blocked Johnson from accessing her social media accounts.

14. In or around January 2015, Troester was transferred from BDSC to the Baghdad Embassy Compound ("BEC").

15. In or around June 2015, Henriquez was promoted to Director of Emergency Medical Services ("EMS").

16. Troester observed Henriquez treat female paramedics, including her, less favorably than he treated male paramedics throughout Troester's tenure with CHS. For example: Henriquez was more accommodating of male paramedics when it came to scheduling PTO and shift assignments requested. If there is a conflict between a male and female paramedic, Henriquez sided with the male paramedic. Henriquez also would scrutinize and return run reports done by female paramedics much more than he would scrutinize and return run reports done by male paramedics, and he refused to schedule female paramedics at Condor or Union III – two desired locations. Henriquez also intervened on behalf of male paramedics who were questioned by the medical staff, but he would not intervene on behalf of female paramedics who were questioned by the medical staff.

17. Troester overheard Henriquez make disparaging comments about women on multiple occasions, including: "You can't trust women;" "women will take you for everything you're worth;" "women are too emotional;" and "women let emotions cloud their judgment."

18. In or around the November or December 2016, Troester heard Henriquez direct Paramedic Lead Johnathan Doyle to write up a female paramedic, Mary Wherry, for crying.

19. In or around September or October 2014, Henriquez entered the clinic at BDSC after seeing one of the ambulances parked incorrectly and said, "Let me guess who was driving, Amber [Troester]?" because Troester was the only female paramedic on shift. Troester was not the paramedic who parked the ambulance incorrectly.

20. In or around September 2016, and again in or around February 2017, Henriquez required Troester to provide coverage for the Emergency room at BDSC when she was on Paid Time Off for travel out of the country. Henriquez instructed Troester that she was to cover the Emergency Room despite the fact that she had already worked an entire shift, and was on leave during those times.

21. Troester was not the only one who observed Henriquez's attitude toward female paramedics and witnessed his derogatory comments about females. Other paramedics, both male and female, reported their observations that Henriquez treated male paramedics more favorably than he treated female paramedics.

22. After Henriquez became Director of EMS in or around June 2015, Henriquez began targeting Troester specifically. For example, Henriquez would change Troester's work schedule last minute, refuse to allow Troester to change her scheduled PTO with colleagues (even when Troester and the colleague requested the swap), scrutinize Troester's run reports in minute detail, ignore Troester's work related emails, and leave Troester off of emails that conveyed relevant, work related information.

23. From the start of Troester's tenure with CHS through the end of 2016, Troester raised concerns to various management officials about Henriquez's discriminatory treatment of

female paramedics. For example:

    a) Troester reported her concerns of discriminatory treatment by Henriquez to BEC Site Lead, Sarah Benson after Henriquez refused to switch Troester's PTO with a male paramedic despite Troester having seniority and both Troester and the other paramedic wanting to switch. Benson was able to switch Troester's PTO with the male paramedic.

    b) Troester often reported Henriquez's unfair treatment of female paramedics Deputy Director of EMS, Lacie Horton-Geerts.

    c) Troester advised CHS Deputy Director of Public Health, Joy Ramsey about Henriquez's treatment of Troester and other female paramedics.

    d) Troester reported to Kevin Clark, her first Paramedic Lead in Iraq, that Henriquez had issues with women. Clark ignored Troester's concerns.

    e) Troester reported to her first Site Lead in Iraq, Nelson Aguilera that Henriquez had issues with women, and Aguilera's response was "you know how it works" and "it's a dick measuring contest" in Iraq.

24. In or around November 2016, Troester's Site Lead at the BEC, Benson left CHS to pursue other opportunities. Within a week or two of Benson leaving, Henriquez returned every single run report submitted by Troester in October 2016, citing various alleged deficiencies. At no point did Henriquez return 100% of the run reports submitted by other paramedics.

25. Throughout mid-December 2016, Chief Medical Officer, Dr. Michael Wynn questioned Troester about her treatment of a patient. Troester, who had followed appropriate paramedic protocols in her treatment of the patient discussed the matter with Dr. Wynn via email, asked Henriquez to intervene on her behalf and explain to Dr. Wynn what supplies were

stocked in the ambulance for Troester to use and what appropriate paramedic protocol was in the instant situation. Henriquez had intervened with Dr. Wynn on behalf of male paramedics previously. For example, Henriquez intervened on behalf of Ricky Robertson when Dr. Wynn questioned Robertson's patient treatment. However, Henriquez ignored Troester's emails regarding the issue with Dr. Wynn.

26. When Troester mentioned to her colleagues that Henriquez was not addressing her issues with Dr. Wynn, at least one colleague replied, "That's because you're a woman." Doyle replied, "That's because you know Geoff [Henriquez] doesn't like you."

27. On or about January 1, 2017, Troester complained to Horton-Geerts about Henriquez ignoring Troester's requests for Henriquez to intervene on her behalf with Dr. Wynn. Horton-Geerts said she understood Troester's frustration with the situation and agreed with Troester's plan to elevate the issue to Deputy Program Manager Nelson Aguilera and Program Manager Marybeth Morrell.

28. On or about January 1, 2017, Troester sent an email to Aguilera and Morrell reporting Henriquez's ignoring Troester's requests that he intervene on Troester's behalf with Dr. Wynn. In the email, Troester stated in part:

> As of the writing of this email I believe the fact that it has not been addressed or corrected is due to Geoff's personal animosity towards me and nothing to do with my professional abilities.
> . . .
> Understandably I fear retaliation for making the above statements and bringing these issues to your attention.

29. A few days later Troester sent a follow up email saying that she had concerns about Henriquez, and that Troester wanted to speak with Morrell about her concerns. Morrell responded that she would be at the BEC on January 12 and that she would speak with Troester at that time.

30. On or about January 12, 2017, Morrell met with Troester and Horton-Geerts in a conference room at the BEC. During the meeting Troester reported her concern about Henriquez returning 100% of her October 2016 run reports and his refusal to respond to Troester's requests that Henriquez intervene on her behalf with Dr. Wynn like he had done previously for male paramedics.

31. Troester also reported that Henriquez's refusal to intervene on her behalf despite intervening with Dr. Wynn on behalf of male paramedics was part of a greater trend of Henriquez treating male paramedics more favorably than he treated female paramedics. Troester also reported to Morrell that Henriquez discriminated against Troester because of the facts the she was a woman and because she was bisexual.

32. In response to Troester's reports to Morrell that Henriquez discriminated against Troester because she was a woman and a bisexual, Morrell cut Troester off and said, "You need to be very careful about your personal feelings." Troester responded that "These aren't my personal feelings, there are things that Geoff [Henriquez] has said and done." Troester then reiterated her complaint that Henriquez had a consistent history or treating Troester differently than he treated male paramedics.

33. Troester reported to Morrell that Henriquez had made disparaging comments about bisexual women, calling them "liars and cheaters."

34. Horton-Geerts attempted to break into the conversation to confirm Troester's statement that Henriquez had a history of treating female paramedics less favorably than male paramedics, but Morrell cut Horton-Geerts off and would not let her speak.

35. Morrell asked Troester for specific examples of Henriquez's behavior in response to Troester's complaints of gender discrimination. In response, Troester reported multiple

specific examples of Henriquez treating female paramedics, and Troester specifically, less favorably than Henriquez treated male paramedics. However Morrell did not acknowledge any of Troester's examples of discriminatory treatment and instead continued to ask for more examples. Morrell then asked Troester if she intended to make a formal complaint about Henriquez's discriminatory conduct, and Troester replied that she did intend to make a formal complaint about Henriquez's discriminatory treatment of her.

36. In response Morrell informed Troester that to make a formal complaint, Troester would have to write down specific dates and incidents and submit the write up to Morrell before Morrell could address any of Troester's concerns with Human Resources. After Morrell left the room, Troester said to Horton-Geerts, "I feel like I just put a bull's eye on my back" to which Horton-Geerts responded, "I think you did too."

37. On or around February 15, 2017, Troester sent Morrell an email reporting, in part, that Troester could deal with HR directly on the matter to save Morrell from being "the middle man." In the same email Troester mentioned that she had a medical issue come up while she was on leave in the US between the January 12 meeting and the February 15 email.

38. Morrell replied to Troester's email by saying that she did not consider herself a middle man. Morrell also attached CHS's Medical Readiness policy. Unbeknownst to Troester, Morrell then filed an Incident Report about Troester regarding the medical issue Troester mentioned.

39. On or about February 16, 2017, Troester was contacted by CHS Nurse Krista Duppell, who inquired as to the incident that occurred with regard to Troester's health issue. Troester explained that there was no incident and asked why a report had been filed. Duppell informed Troester at that time that Morrell had requested an Incident Report be filed with regard

to Troester.

40. In or around the beginning of March, 2017, Troester was informed that her PTO was being moved from May 2017 to April 2017 and that she would have to get her annual medical evaluation while on PTO. Due to the short notice, and other complicating factors, Troester had a difficult time securing airfare and requested an exception to the Fly America Act.

41. Despite being eligible for an exception to the Fly America Act, CHS's Senior Business Administration Manager LeeAnn Tufts informed Troester that her request for an exception was denied.

42. Around this same time, Tufts requested Troester's flight itinerary for the tickets Troester's friends were purchasing for Troester as a gift. Tufts informed Troester that Troester had to submit her flight itinerary per the Fly America Act, and that the Contracting Officer had to approve Troester's flight itinerary prior to Troester's travel stipend being issued.

43. Tufts' statements were not true, and Troester did not have to submit her flight itinerary per the Fly America Act as the tickets were being purchased by a third party, as a gift.

44. In or around May 2017, after Troester's travel, another CHS employee, Patty Sherrill, traveled in and out of the United States with tickets bought by a third party as a gift. Sherrill was told by Morrill that tickets bought as a gift do not have to meet the Fly America Act, and do not need to be approved by the Contracting Officer.

45. Sherrill was not required to submit her travel itinerary to Tufts for approval, or to process her travel stipend.

46. On or around March 30, 2017, Troester got in touch with Michael Shamblen, CHS's Human Resources Manager located in Cape Canaveral, Florida, and reported her concerns about Tufts not providing Troester with a Fly America exception despite Troester

meeting all of the requirements.

47.     On or about April 6, 2017, only six days before Troester was scheduled to go on leave, Henriquez informed Troester that she was being moved from the BEC to Basra. Henriquez instructed Troester to inventory all of her belongings and clear out her room before she left for PTO.

48.     On or around April 6, 2017, Troester attempted to contact Shamblen to discuss additional acts of discrimination by Henriquez and management, specifically, being told to pack and inventory her belongings. Despite Troester's repeated attempts to get in touch with Shamblen or another HR representative, Shamblen was not responsive to Troester.

49.     On or around April 12, 2017, Troester filed a complaint of discrimination with the State Department's Office of Civil Rights ("S/OCR") on the basis of sex, sexual orientation, and retaliation. Troester then communicated with Megan McPhee through the summer of 2017, in furtherance of the S/OCR's investigation of Troester's complaint.

50.     On or about August 4, 2017, the S/OCR issued Troester a Notice of Right to File a Discrimination Complaint with the S/OCR.

51.     On or about August 12, 2017, Troester filed a Formal Complaint of Discrimination with the S/OCR on the basis of sex, sexual orientation, and retaliation. However, because Troester was not a federal employee, the S/OCR dismissed Troester's filing for failure to state a claim against the Agency.

52.     While on leave in the United States in or around May 2017, Troester needed to obtain a new visa to return to Iraq. Troester promptly contacted Trish Hook, who is responsible for processing visas at CHS. Hook informed Troester what Troester needed to do to get the new visa and told Troester that the process would be expedited and should take approximately ten

business days to process. However, Troester did not hear back from Hook or CHS regarding her visa despite promptly submitting all of the required documentation and information. When Hook was responsive, Morrell was carbon copied on the emails.

53. Toward the end of May 2017, Tufts sent Troester CHS's Leave Without Pay Policy, which provides that if an employee was away on Leave Without Pay status for more than 30 days the employee would lose their position at CHS and have to re-apply.

54. Troester worked independently with the Embassy of the Republic of Iraq to ensure her visa was processed in a timely manner, and Troester ultimately returned to work in Iraq on or about June 7, 2017.

55. On or about June 12, 2017, Troester traveled to her new work site in Basra. Upon arrival Troester discovered that none of her personal items had been delivered to Basra.

56. Upon inquiry, Troester was informed that someone, who was not identified, directed logistics to place all of Troester's belongings in storage because Troester may be stationed at BDSC, not Basra. Troester was never informed that she may be stationed at BDSC as opposed to Basra.

57. CHS ultimately told Troester that it would ship her personal belonging to her in Basra, but only one of Troester's boxes ever arrived at Basra.

58. When Troester inquired about her second box of items, she was told by then Patient Administrator Allison Gegzna that CHS has a one box policy. However, this is not true and CHS instead has a seventy pound policy for shipping personal items for employees.

59. Troester knows of other CHS employees who shipped more than one box of personal items between work locations. For example, CHS shipped three or four boxes of personal items to BEC for paramedic Monica Richards, and CHS shipped five or six boxes of

personal items for Paramedic Lead Scott Eichinger when he was transferred from Basra to BDSC.

60. On or around October 4, 2017, Troester received a telephone call from Morrell, who informed Troester that Tufts and Aguilera were also on the call. Morrell the told Troester that CHS had decided not to renew Troester's contract. Morrell declared that CHS no longer needed Troester's services.

61. Troester's last day as an employee for CHS was November 1, 2017, and she left Iraq on November 2, 2017.

62. On or about November 20, 2017, Troester filed a Charge of Discrimination based on sex and sexual orientation with the EEOC.

63. Over 180 days has lapsed since Troester filed her Charge of Discrimination.

## COUNT I
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## 42 U.S.C. § 2000e, *et seq.*
## Discrimination Based on Sex

64. Troester incorporates the allegations in the foregoing paragraphs as though alleged herein.

65. Troester is an "employee" as the term is defined at 42 U.S.C. § 2000e(f).

66. CHS is an "employer" as the term is defined at 42 U.S.C. § 2000e(b).

67. CHS violated 42 U.S.C. § 2000e, *et seq.*, by terminating Troester on account of her sex.

68. CHS unlawfully discriminated against Troester by treating her more harshly that it did other, male employees.

69. The reasons for terminating Troester's employment, that CHS no longer needed Troester, are false and are pretext for unlawful discrimination.

70.	Troester has exhausted her administrative remedies under Title VII.

71.	For CHS's unlawful discrimination against Troester, pursuant to Title VII, Troester is entitled to general and special damages, economic damages including front and back pay, reinstatement, promotion, compensatory damages, reasonable attorney's fees to be paid by CHS, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

## COUNT II
### Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000e, *et seq.*
### Discrimination Based on Sex

72.	Troester incorporates the allegations in the foregoing paragraphs as though alleged herein.

73.	Troester is a bisexual female.

74.	Troester is an "employee" as the term is defined at 42 U.S.C. § 2000e(f).

75.	CHS is an "employer" as the term is defined at 42 U.S.C. § 2000e(b).

76.	CHS violated 42 U.S.C. § 2000e, *et seq.*, by terminating Troester because she did not conform to female gender stereotypes.

77.	CHS unlawfully discriminated against Troester by treating her more harshly that it did other, heterosexual employees.

78.	The reasons for terminating Troester's employment, that CHS no longer needed Troester, are false and are pretext for unlawful discrimination.

79.	Troester has exhausted her administrative remedies under Title VII.

80.	For CHS's unlawful discrimination against Troester, pursuant to Title VII, Troester is entitled to general and special damages, economic damages including front and back pay, reinstatement, promotion, compensatory damages, reasonable attorney's fees to be paid by

CHS, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Amber Troester respectfully requests that the Court enter judgment in her favor and award to her the following relief:

A. Judgment against Defendant CHS in an amount of any wages, salary, employment benefits, or other compensation denied or lost to Troester, including economic damages, liquidated damages, compensatory and punitive damages to be determined at trial;

B. Re-employment, reinstatement, promotion, front pay, or other equitable relief;

C. Pre-judgment interest;

D. Interest due on unpaid wages;

E. A reasonable attorney's fee and costs of this litigation;

F. Reasonable expert witness fees; and

G. Any other relief that this Honorable Court deems just and proper to award.

## JURY DEMAND

Plaintiff demands a jury for all issues proper to be so tried.

Respectfully submitted,

*/s/ Janel Quinn*

Janel Quinn, Esq.
VSB# 89503
R. Scott Oswald, Esq.
VSB# 41770
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
jquinn@employmentlawgroup.com
soswald@employmentlawgroup.com